Neil L. Henrichsen, Esq.
Henrichsen Siegel, P.L.L.C.
Attorneys for Plaintiffs
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036
(202) 862-4357
(202) 379-9792 (facsimile)
E-mail: nhenrichsen@hslawyers.com
      service@hslawyers.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**(NEWARK DIVISION)**

———————————————————————x

**CRAIG D. PRICE,**

     Plaintiff,

v.

**UBS FINANCIAL SERVICES, INC.,**

     Defendant.

———————————————————————x

                                 **COMPLAINT**

                                 No. _____ ECF CASE
                                 Jury Trial Demanded:  Yes

Plaintiff, **CRAIG D. PRICE**, by and through his undersigned counsel, by way of

Complaint against Defendant **UBS FINANCIAL SERVICES, INC**., seeks relief for violations

of laws protecting employees from unlawful retaliation and in support thereof states:

**INTRODUCTION**

1.     Plaintiff Craig D. Price ("Price" or "Plaintiff") was a productive and well-

regarded employee of the Defendant UBS Financial Services, Inc. ("UBS") since 2000, and had

a very successful career until after his disclosure and reporting of wrongful and unlawful acts at

UBS.  Thereafter, Defendant UBS engaged in a campaign of harassing and retaliatory conduct

leading to the wrongful termination of Mr. Price in February, 2016. As a result of the wrongful

termination of Mr. Price, he has suffered loss of pay, benefits and serious damage to his career. Plaintiff brings his claims as a whistleblower subjected to unlawful retaliation in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), 12 U.S.C. §§ 5301, *et seq*. and the Florida Whistleblower Act, Fla. Stat. §§ 448.101-448.105.

## JURISDICTION & VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

3.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) as some or all wrongful acts occurred in this District and the Defendant may be found in this District.

## PARTIES

4.      At all times relevant herein, Plaintiff Price has been an experienced professional in the financial services industry, with nearly 24 years of employment in the field.  Plaintiff began working for the Defendant in 2000[1] and had a very successful career until his wrongful termination in February, 2016.

5.      At the time he stopped working for Defendant, Mr. Price was Senior Vice President of Investments and a Private Wealth Advisor in the UBS Stuart, Florida office. Mr. Price also was senior partner and founder of Price Wealth Management which was officially recognized within UBS as a wealth management team in 2008.

6.      During all times relevant herein, Mr. Price held a Series 7 license, a Series 63 license, a Florida license in life insurance, health insurance and annuities.  Additionally, Plaintiff is licensed as a financial advisor in approximately 25 states. Mr. Price is also a Certified Financial Planner™ in good standing with the CFP Board of Standards and a Certified Trust and Financial Advisor in good standing with the American Bankers Association.

---

[1] Mr. Price was initially employed by PaineWebber which was acquired by UBS AG in 2000.

7.     UBS is a Delaware corporation, with its principal place of business located in Weehawken, New Jersey, and provides, among other things, financial advisory services to high net worth individuals in the United States.

8.     UBS is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") which is a private corporation that acts as a self-regulatory organization that regulates member brokerage firms and exchange markets. FINRA is overseen by the Securities and Exchange Commission, the ultimate regulator of the securities industry. FINRA promulgates rules and publishes regulatory notices which provide guidance to its member firms and the public regarding its rules and its role as a regulator of securities firms and brokers.

## FACTUAL ALLEGATIONS

9.     Mr. Price and his team were consistent top producers for UBS from 2000 until Mr. Price's termination in February 2016. In fact, Mr. Price had previously been named to the UBS Global Circle of Excellence and President's Council--among UBS's highest recognitions for productivity and leadership. For several years, Mr. Price was in the top 10% of producers for UBS in Southeast Florida.

### Early Relationship with Melchior

10.    Sometime in 2008, Mr. Price met Dennis Melchior ("Melchior"), a new employee in UBS's Stuart, Florida office.

11.    In getting to know Melchior, Mr. Price learned about his background in institutional fixed income management. This type of experience was unusual for a retail advisor insofar as most retail advisors typically have no institutional experience. Melchior's experience in fixed income management was valued by Mr. Price because it allowed him to bring enhanced

expertise and experience to his clients who were generally in need of fixed income assets in their portfolios.

12.     Melchior's experience, which was different from Mr. Price's, led Mr. Price to work with Melchior more closely over time. While working with Mr. Price and his clients, Melchior sought Mr. Price's trust.

13.     Over the next few years, Mr. Price and Melchior worked closely together, collaborating on developing investment strategies for Mr. Price's various clients. They also worked together to promote UBS's financial services to prospective clients in the South Florida area.

<u>Introduction to Nancy Tsai and the Marston Trust</u>

14.     Sometime in early 2010, Melchior introduced Mr. Price to Nancy Tsai, a friend of Melchior and potential client. Melchior described Ms. Tsai as a potential client for UBS's financial advice and investment services.

15.     While Mr. Price was aware of the friendship between Melchior and Ms. Tsai, he was not aware of any romantic involvement between them at the time.

16.     In 2010, Ms. Tsai became a client of UBS with Mr. Price listed as her financial advisor. However, in his role on Price's team, Melchior dealt with Ms. Tsai's account on a day to day basis.

17.     After Mr. Price and Melchior's initial review of Ms. Tsai's financial status in March 2010, they recommended that she drastically reduce her expenditures. While Tsai's then net worth was in the millions, Mr. Price told Tsai that if she did not reduce her spending, she would face potential insolvency and financial hardship within 5-6 years.

4

18.    Beginning in 2011, Ms. Tsai and Melchior mentioned Ms. Tsai's friend, Helga Marston, to Mr. Price as a potential client on several occasions. A childless widow and Holocaust survivor, Helga Marston was in her early nineties and was extremely wealthy. Ms. Tsai was a very close friend/caregiver of Mrs. Marston's.

19.    With Tsai's assistance, Melchior began to meet with Mrs. Marston to get to know her and to bring her and her trust's investment accounts to UBS. Mr. Price advised Melchior on how to conduct these meetings. Melchior reported to Mr. Price about his interaction with Mrs. Marston; however, both Melchior and Ms. Tsai dissuade Mr. Price from meeting with or talking directly to Mrs. Marston. They would describe Mrs. Marston as increasingly private and trusting only Ms. Tsai.

20.    In June 2011, the Marston Trust opened an account at UBS with Mr. Price and Melchior as the financial advisors on the account (the "Marston Trust Account" or the "Account"). Melchior and Mr. Price shared the investment planning responsibilities for the Marston Trust Account.

21.    Melchior, however, was the only person at UBS who had direct contact with Mrs. Marston. Melchior would report to Mr. Price about his meetings and dealings with Mrs. Marston.

22.    Through 2011 Melchior and Ms. Tsai began to attend events, including UBS company events, together as a couple. Ms. Tsai appeared very interested in Mechior's success at UBS and assisted him to build relationships by introducing him to her social network in the Palm Beach, Florida community.

23.    In December 2011, Ms. Tsai was granted Power of Attorney ("POA") of the Marston Trust Account at UBS. The form used to give her these powers was a UBS form which was approved by UBS compliance personnel. In connection with her new authority over the

Marston Trust Account, Ms. Tsai became a signatory on the Marston Trust Account with UBS. UBS gave Ms. Tsai authority to write checks drawn on the Account and a credit card in her name tied to the Marston Trust Account.

24.    Mr. Price was informed by Melchior that Ms. Tsai was granted POA of the Marston Trust Account at UBS. Mr. Price believed Tsai's POA was limited to the ability to make investment decisions on behalf of the Trust based on his conversations with Melchior and his experience with the UBS POA form.

25.    Once Ms. Tsai was granted POA, quarterly meetings to review the performance of Marston Trust Account were held between Ms. Tsai and Melchior. Mr. Price would rarely attend these meetings since Melchior was a trusted business partner and had relationships with Ms. Tsai and Marston.

26.    In December 2012, Melchior began driving a Mercedes Benz S350 to the office. Melchior advised Mr. Price and others that "Nancy" (Ms. Tsai) got it for him as a Christmas present.

27.    On December 19, 2012, Melchior and Ms. Tsai attended the UBS Christmas holiday party as a couple. Several members of UBS management were in attendance including Randy Marsh, assistant manager for the UBS complex (all UBS branch offices from Jacksonville to the South/Southwest Florida area) and Timothy Durno, manager of the Stuart, Florida UBS branch.

### Melchior moves to Palm Beach Branch of UBS

28.    In January 2013, Melchior was promoted by UBS and given permission by Complex Manager, Bradford Smithy, to transfer to UBS's Palm Beach branch. As a result of this

transfer, Mr. Price and Melchior no longer interacted on a daily basis. However, they still spoke about their mutual clients several times a week by telephone.

29.     Once Melchior was no longer observed by Mr. Price on a day to day basis, Melchior's marketing efforts to build his business in the wealthy Palm Beach community began in earnest. With the help of Tsai's introductions, Melchior began entertaining ultra-wealthy prospects 3-4 nights per week.

30.     On January 12, 2013, Melchior attended the Pink Tie Ball with Ms. Tsai at Mar-a-Lago, Palm Beach. Melchior and Ms. Tsai hosted a table of UBS guests, including Mr. Price, UBS clients and prospects. The table for 10 guests cost $5,000.00. At the time, Melchior led Mr. Price to believe the cost was paid by Melchior personally or by Ms. Tsai with her own funds.

31.     On February 20, 2013, Melchior and Ms. Tsai sponsored the Lighthouse International Fundraiser in order to meet and cultivate potential UBS clients. The cost to attend was $10,000.00.

32.     On February 25, 2013, Melchior, through the UBS Palm Beach branch, sponsored a benefit luncheon in conjunction with the Palm Beach Round Table at the Colony Hotel. The event was held to benefit a large UBS institutional client, the Vaccine and Gene Therapy Institute of Florida Corporation ("VGTI"), a state-funded research facility. Hermè de Wyman Miro, Chair of Palm Beach Roundtable, publically thanked Melchior, Ms. Tsai and UBS for their sponsorship and presented them with a gift. Approximately 30 UBS clients and prospects were in attendance at no cost to guests. Mr. Price believed that Melchior paid for the cost of the luncheon.

33.     On March 19, 2013, Melchior and Tsai organized a three course dinner in Palm Beach with UBS guest speaker, Jeff Hans, an equity analyst from UBS headquarters. The

7

invitation only dinner was held at Café L'Europe's private room for UBS clients and prospects. Mr. Price had to leave early. At conclusion of evening, Mr. Price's junior partner, William Gilcher observed that Ms. Tsai—rather than Melchior—paid for the event using a credit card.

34.     In March 2013, Melchior and Ms. Tsai co-chaired VGTI's annual Bio-Ball benefit to raise funds for its research efforts. UBS, Melchior, and Price committed $15,000.00 together for a Silver sponsorship in UBS's name.

35.     However, prior to the event, Melchior told VGTI CEO Mel Rothberg that Mrs. Marston wanted to "donate" $5,000.00 to VGTI in memory of Melchior's mother who had died one year early. Mrs. Marston's "donation" was credited to UBS, raising its status to a Gold sponsorship. Melchior and Ms. Tsai receive the highest recognition at the event.

36.     During this time, Mrs. Marston had fallen and broken her pelvis, leading to a hospital stay and eventual release to an assisted living facility. Mr. Price was told that Mrs. Marston was still of sound mind after her injury by Melchior and Ms. Tsai. As a result, Mr. Price was not concerned that Mrs. Marston was under the daily care of the staff at the assisted living facility.

37.     However, as was later discovered by Mr. Price, Mrs. Marston's health care providers at the time were of the opinion that she was suffering from dementia/Alzheimer's disease and had little mental capacity.

<u>Mr. Price's Discovery of the Fraudulent Use of Marston Trust Funds</u>

38.     In or around February or March 2013, Melchior mentioned to Mr. Price that Mrs. Marston was purchasing a second apartment for a future caregiver to live in. Melchior indicated she wanted someone close by but not living in her apartment. Mr. Price did not feel that was an unusual plan for a wealthy, reclusive person like Mrs. Marston.

39.     On April 5, 2013, Melchior called Mr. Price from the Palm Beach office. Melchior was irate, yelling and cursing about UBS Complex Administration personnel blocking the wire transfer of $2,350,000.00 from the Marston Trust Account's securities-backed line of credit to the closing agent for the purchase of a penthouse apartment in Mrs. Marston's building. Melchior was furious and venting angrily to Mr. Price about the thwarted wire transfer.

40.     Due to the amount of the wire transfer, verbal approval by a regional compliance officer at UBS's main hub office in Florida was required. At the time, Jan Cowart of UBS would have had to approve the wire transfer for the transaction to close.

41.     When asked by Mr. Price why the wire transfer was declined, Melchior said there was a mistake on the paperwork and the purchase contract was in Ms. Tsai's name only. UBS Complex Administration was requiring that the paperwork be redone so that the purchaser and owner after closing would be the Marston Trust.

42.     Tim Durno, the Stuart branch manager for UBS, became involved with Melchior because Melchior had been complaining angrily to the Palm Beach UBS branch manager, Randy Marsh.

43.     Mr. Price felt that Melchior's reaction to the situation set forth in paragraphs 38-42 herein, was disproportionate to the situation. As a result, Mr. Price became suspicious of Melchior.

44.     In the ensuing days following the failed wire transfer, Mr. Price had printed several months' worth of UBS statements and credit card statements for the Marston Trust Account specifically for a review of the expenditures.

45.     Upon careful review of these statements and comparison of transaction dates and Mr. Melchior's business calendar, Mr. Price found many instances of events to benefit UBS

directly or to benefit Melchior, a UBS employee, directly which were authorized by Ms. Tsai and paid from the Marston Trust Account.

46.    Each of these charges or payments from the Marston Trust Account identified by Mr. Price violated laws and rules regulating Defendant UBS and its employees.

47.    After identifying the first clear fraudulent transaction, Mr. Price notified Brad Smithy, the UBS Complex manager, by telephone that there were serious problems with Melchior and that he was still investigating.

48.    The next day, Mr. Price sent a detailed email to Brad Smithy with copy to Tim Durno and John Mathews identifying all the instances in which Mr. Price believed Melchior and/or Ms. Tsai had misused Marston Trust Account Funds. Smithy forwarded the email from Mr. Price to Saline Gerber, a UBS internal investigator.

49.    On or about April 15, 2013, Melchior was placed on administrative leave by UBS, pending its internal investigation of Mr. Price's discovery and allegations.

50.    During the days that followed, Mr. Price was interviewed by Ms. Gerber. Mr. Price informed Ms. Gerber of all his concerns about how Melchior had been spending or participating in the spending of the Marston Trust Account Funds for his own personal benefit, for the benefit of UBS clients and to develop prospective clients for the benefit of himself and UBS.

51.    During an in-person meeting with Brad Smithy at the Palm Beach office on or about April 19, 2013, Mr. Price and Smithy discussed the potential for bad publicity for UBS in the Palm Beach community due to the actions of Melchior and Ms. Tsai. Smithy assured Mr. Price that UBS was investigating the matter thoroughly.

52.    On or about April 23, 2013, UBS fired Melchior.

53.     Timothy Durno explicitly advised Mr. Price not to discuss the matter of Melchior and Tsai's wrongdoing with anyone.

54.     In making its required Form U5 disclosure to FINRA regarding its termination of Melchior, UBS failed to fully and accurately state the reason for Melchior's termination. UBS simply reported that its management had "lost confidence in Mr. Melchior's professional judgment" for reasons including his failure to report possible conflict of interest concerns related to a trust account. UBS did not mention the misuse of a client's funds by Melchior or his participation in exploiting an elderly woman with dementia for his own personal financial benefit and gain.

55.     The By-Laws of FINRA required firms, such as UBS, to provide timely, complete and accurate information on Form U5. Further, FINRA's By-Laws required that when a firm learns of reasons or facts which make its prior U5 disclosure about a person's termination inaccurate or incomplete, an amended U5 must be submitted.

56.     On or about April 30, 2013, the purchase of the Palm Beach penthouse apartment in the name of the Marston Trust closed, using funds from the Marston Trust Account credit line. Ms. Tsai immediately began using funds from the Marston Trust Account to renovate the apartment, spending close to $500,000.00.

57.     In June 2013, Ms. Tsai, using her authority pursuant to UBS's POA form, transferred the entire Marston Trust Account to Fidelity Investments. Ms. Tsai then named Melchior as an "investment advisor", paying him $7,500.00 per month, despite the fact Fidelity Investments had financial advisors who could provide investment advice for the Marston Trust Account.

11

58.    UBS took no further action with regards to Ms. Tsai or Melchior despite its knowledge that Mrs. Marston was a likely victim of elderly exploitation and financial abuse based on Mr. Price's investigation and disclosures to UBS's management.

59.    Consistent with the standard for reporting suspicious activity as provided for federal regulations, if a financial institution, like Defendant UBS knows, suspects, or has reason to suspect that a transaction has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the financial institution knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction, the financial institution should then file a Suspicious Activity Report with the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").

60.    Based upon Mr. Price's investigation and disclosures to UBS's management about the Marston Trust Account, Defendant UBS should have submitted one or more Suspicious Activity Reports related to Melchior and Ms. Tsai's financial exploitation of Helga Marston and the Marston Trust Account to FinCEN. Defendant UBS, however, failed to do so.

61.    Additionally, Defendant UBS has never amended Melchior's U5 to accurately reflect his financial exploitation of Helga Marston and the Marston Trust Account and his violation of FINRA Rules 2010 and 2150.

<u>FINRA Investigation of Melchior</u>

62.    On or about April 23, 2014, Ms. Tsai was arrested in the State of Florida and charged with exploitation of an elderly person for $100,000 or more, and theft on a person older than 65. The charges stemmed from Ms. Tsai's misuse of the Marston Trust Account while at

UBS and later at Fidelity. The alleged fraudulent transactions included some of those identified by Mr. Price involving Melchior and Defendant UBS.

63.     In 2014, FINRA opened an investigation of Melchior and his involvement with the Marston Trust Account to determine whether there had been any violations of the federal securities laws or FINRA's rules. Mr. Price was called to testify by FINRA in its investigation of Melchior.

64.     In preparation for this testimony, Mr. Price met with UBS's lawyers, both in-house and outside counsel, and provided the information he had regarding the unlawful acts of Melchior, Ms. Tsai and the suspicious transactions and expenditures he had found during his review of the Marston Trust Account investment account statements, credit card statements and checks.

65.     During this deposition preparation session, Mr. Price told UBS's lawyers about Ms. Tsai's arrest and his contact with the Palm Beach County Police, offering the information he had gathered about Ms. Tsai and Melchior to assist with the investigation.

66.     On or about July 24, 2014, Mr. Price was deposed by lawyers from FINRA. Also, present was, among others, Andrew Sidman, lead outside counsel for UBS as well as Mr. Price and Liz Small, in-house counsel for UBS.

67.     Mr. Price testified extensively before FINRA regarding unlawful acts of Melchior, his relationship and dealings with Melchior, Ms. Tsai, Mrs. Marston, his discovery of the suspicious transactions and his reporting of the same to UBS management.

<u>Retaliation against Mr. Price Begins</u>

68.     A few weeks after Mr. Price's testimony before FINRA, in mid-August 2014, he was contacted by Andrew Sidman. Mr. Sidman claimed that FINRA had additional questions about Mr. Price's disclosures to UBS management and the timing of these disclosures.

69.     Mr. Sidman asked Mr. Price to provide the daily personal journal entries Mr. Price had kept contemporaneously with his investigation of Melchior and the Account transactions. Mr. Price complied with Mr. Sidman's request in a timely fashion.

70.     These journal entries contained detailed information regarding Mr. Price's investigation of Melchior and Ms. Tsai and his reports to management about Melchior's actions which appeared to violate UBS's policies related to the use of client's funds, the exploitation of vulnerable clients, various FINRA rules and possibly, laws against theft and elder abuse.

71.     After providing these journal entries to Mr. Sidman, Mr. Price heard nothing further about FINRA's additional questions about his disclosures to UBS management.

72.     During the fourth quarter of 2014, Mr. Price kept a light work schedule due his duties as caregiver for his wife who was recovering from medical treatments.

73.     Following Mr. Price's return to full time work at UBS, Defendant UBS's management began to question Mr. Price regarding his dinner marketing events. Specifically, Jan Cowart and Denise Peloza, the Southeast Florida Regional Compliance Officers, began questioning the paperwork supporting Mr. Price's and his team's dinner events. They even threatened the issuance of verbal warnings for Price's alleged failure to comply with UBS's policy regarding business entertainment.

74.     Mr. Price and his team were surprised by Cowart and Peloza's demands because 1) the paperwork submitted was already well beyond what was required by UBS's written

policy, and 2) they had submitted the same paperwork for similar events in 2013 and 2014 *without ever being questioned.*

75.     It was not until after Mr. Price's testimony before FINRA and the disclosure of his journal entries to UBS that Cowart and Peloza began questioning the dinner marketing events held by Mr. Price and his team.

76.     In July 2015, Mr. Price received approval from UBS Regional Compliance to present a series of seminars with a local concierge physician, focusing on financial planning for healthcare expenses and endorsing the concierge approach to medical care. Three seminar dates were approved by the compliance office in a prompt and timely manner--within 2 weeks of Mr. Price's request. All documentation required by UBS was submitted by Mr. Price's team.

77.     The first two seminars with the local concierge physician were very successful with 25-30 prospects and UBS clients in attendance.

78.     In or around August 2015, UBS was served with a complaint by FINRA related to a client of Mr. Price's, Mr. Ulano. In 2014, Mr. Ulano had sent written complaints directly to UBS on three separate occasions regarding trades in Cardero Resource Corp. ("Cardero"), whose stock he had purchased several years prior based upon Mr. Price's recommendation. Three times UBS denied Mr. Ulano's complaints, stating that there was no wrongdoing by Mr. Price or UBS.

79.     In late August 2015, under the guise of preparing a response to the Ulano complaint, Peloza, UBS Regional Compliance officer, told Mr. Price to schedule a conference call with Michael Starr, UBS's outside counsel allegedly handling the Ulano complaint. Because UBS had investigated and denied Mr. Ulano's complaints three previous times, Mr. Price felt the call would be fairly routine.

80.     However, the call with Mr. Starr quickly turned into an interrogation of Mr. Price. Mr. Starr spent substantial time questioning Mr. Price about his history of investing in the Cardero stock going back to 2009. Following this call, Mr. Price realized UBS was targeting him for special review related to the Cardero stock.

81.     In October 2015, UBS's Compliance officers insisted that Mr. Price and his team re-do the invitations to the third seminar with the local concierge physician. Despite the fact that there was no UBS policy requiring the changes, UBS Compliance officers Cowart, Peloza and Kathy Lauritano were insistent that the invitations had to be changed to add more disclosure language.

82.     Mr. Price and his team questioned their reasoning for the change to the invitations since there was no difference between the first two seminars whose invitations UBS approved and the third seminar. However, Cowart, Peloza and Lauritano refused to explain their request or the basis for the request in UBS policy.

83.     UBS policy at the time allowed disclosures like the one insisted upon by UBS Compliance to be made during the actual presentation. There was no requirement that the disclosure be on the invitation. However, Cowart, Peloza and Lauritano insisted on the change to the invitation, indicating that if Price and his team did not make the change, they would be out of compliance with UBS policy.

84.     In order to not suffer embarrassment with a local concierge physician and lose the marketing opportunity, Mr. Price agreed to change the invitation. However, because the request caused a delay in sending the invitations, there was poor attendance due to the lack of sufficient notice to potential attendees.

85.     Price had not previously experienced this kind of obstacle to his marketing events by UBS, especially when the same seminar had been very successful in the recent past.

86.     On or about November 3, 2015, UBS settled the Ulano complaint for $14,500.00 for business reasons. UBS did not ask Mr. Price to participate in funding the settlement amount.

87.     On or about November 10, 2015, Mr. Price was questioned in person for 6 hours by Mr. Starr regarding his six-year history of researching and recommending Cardero stock. In addition to Mr. Starr and Mr. Price, others present during this interrogation session from UBS were Jan Cowart, Denise Peloza, Peter Foley (SE Florida Complex Director at the time) and Clifford Mandody (the Stuart, Florida UBS Branch Manager). Another lawyer from Riker Danzig, A.J. Borelli, was also present.

88.     Prior to the November 10 interrogation, Mr. Price inquired repeatedly of Peloza what the agenda for the meeting would be, so that he might properly prepare. He was told no preparation was needed, he would just be answering some questions. Mr. Price was not advised to have his own lawyer present, nor told that his employment might be jeopardy.

89.     As a result, Mr. Price felt ambushed and not fully prepared to address questions regarding transactions which occurred several years in the past. Mr. Price was not provided with any of the documents presented to him by Mr. Starr in order to properly respond to question posed.

90.     From the time Mr. Price began to follow and research Cardero up through the time he placed trades for UBS clients in its stock, Mr. Price routinely submitted a Solicitation Approval Form ("SAF") to UBS Compliance as required by UBS's policy. Of the thirteen SAFs submitted by Mr. Price to UBS for approval over a three year period or more, **none** were rejected; all were approved.

91.     During this same time period (November-December 2015), Mr. Price and his team partnered with another local concierge physician, Dr. Neil Boland, to offer two dinner seminars due to the success of the previous seminars focusing on financial planning for healthcare expenses.

92.     Unlike the timely approval received for the prior seminars with a local concierge physician, UBS Compliance rejected Dr. Boland's presentation, requiring numerous revisions to his presentation which delayed the scheduling of the seminars to 2016. The delay created by UBS resulted in no marketing seminars being held at all at the end of 2015.

93.     The heightened scrutiny of Dr. Boland's presentation was unwarranted as there was no basis in UBS policy for it. This treatment was uncharacteristic of the treatment Mr. Price had experienced throughout his long career at UBS.

94.     In January 2016, at luncheon at the UBS Stuart, Florida office with Martin County Community Foundation ("MCCF") Board members and its executive director, Mr. Price offered to sponsor benefit luncheon for MCCF to be scheduled for February 2016. Present at this luncheon were UBS branch manager, Clifford Mandody, and other UBS employees. Mr. Mandody consented and enthusiastically endorsed Mr. Price's idea to sponsor the benefit luncheon, stating to all present that it was a "good idea".

95.     However, UBS Compliance personnel prohibited Mr. Price from fulfilling his public promise of the $500.00 sponsorship for MCCF. Branch manager, Cliff Mandody, reversed his previous public support and supported UBS Compliance personnel's decision to block Mr. Price's sponsorship.

96.     Prior to this incident, Mr. Price had never been prohibited from sponsoring an event for a non-profit client.

97.     In fact, UBS's actions to prevent Mr. Price from sponsoring a luncheon to benefit his non-profit client MCCF was directly contrary to the UBS approved sponsorships for the Atlantic Classical Orchestra in 2013, 2014 and 2015 and for the Vaccine and Gene Therapy Institute, Inc. in 2013 and 2014. Both of these non-profits were clients of Mr. Price.

98.     Not only was Mr. Price publicly embarrassed because he was prohibited by UBS from honoring his commitment to MCCF, UBS prohibited him from even attending the luncheon which was totally outrageous because UBS allowed branch manager Clifford Mandody and other UBS employees on Mr. Price's team to attend.

99.     Mr. Price complained to UBS Regional Compliance Officers, Jan Cowart and Denise Peloza, that they were singling him out and treating him differently in this instance because none of his other sponsorships were ever questioned, let alone prohibited by UBS.

100.    On or about February 29, 2016, Mr. Price was fired by UBS at a meeting with Peter Foley, UBS Complex Manager and Clifford Mandody, UBS Stuart, Florida Branch manager. Mr. Price was told the decision to terminate his employment went all the way to the top, to Tom Naratil, the new President of UBS Americas, Inc.

101.    Mr. Price was told the reasons for his termination were for various policy violations related to trading in Cardero stock. However, other than the one or two interrogation sessions by Michael Starr, Mr. Price had never been allowed to specifically address any of the allegations being made by UBS which could all be refuted by him.

102.    Further, UBS deliberately used damaging language to describe the reasons for Mr. Price's discharge on the U5 for Mr. Price, knowing it would be reviewed by future potential employers, clients and prospective clients. The language used by UBS rendered Mr. Price unemployable and damaged his reputation in the industry.

103.    All conditions precedent to the filing of this lawsuit have been met, have been satisfied or have been waived.

**COUNT ONE**
**Retaliation in Violation of Dodd-Frank Act**
**(15 U.S.C. §78u-6)**

104.    Plaintiff incorporates by reference and realleges each of the allegations contained in Paragraphs 1-103 of this Complaint with the same force and vigor as if set out here in full.

105.    Following Plaintiff's testimony in the FINRA proceeding regarding Melchior, his offer to assist the police in its investigation of Ms. Tsai and his disclosure of detailed information regarding his reporting of unlawful activity to UBS management, Defendant UBS engaged in a campaign of retaliatory harassment against Plaintiff, including a course of action designed to place Mr. Price in a negative light in relation to his history of trading in Cardero stock, which served as the pretext for his termination and to further destroy his reputation and career in the financial services industry.

106.    Upon information and belief, Defendant UBS retaliated against Mr. Price because of his reports to UBS management of Melchior's and Ms. Tsai's unlawful acts, including thefts from the Marston Trust Account and financial exploitation of Mrs. Marston as well as Plaintiff's testimony before FINRA regarding the same.

107.    Furthermore, Plaintiff's FINRA testimony and detail journal entries made it clear that UBS: (1) failed to submit the required SAR to FinCEN regarding Melchior and Ms. Tsai's misuse of funds in the Marston Trust Account, (2) failed to report the reasons for Melchior's termination fully and accurately on the U5 form, and (3) failed to promptly amend the U5 form related to Melchior when the true extent of fraud and exploitation by Melchior was known to UBS.

108.    Defendant UBS's failures permitted the financial exploitation of Mrs. Marston and the misuse of the Marston Trust Account funds by Melchior and Ms. Tsai to continue, even after Tsai moved the Account to a different financial institution.

109.    Further, Mr. Price's testimony and information demonstrated that Defendant UBS violated FINRA Rule 2150 which prohibits the misuse of its client's funds as well as FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade) and Rule 4350 for UBS's failure to report the violations of these Rules.

110.    The above-described course of action initiated by Defendant UBS following Mr. Price's July 2014 FINRA testimony was wrongful and was clearly retaliatory against Plaintiff Price.

111.    The Dodd-Frank Act, 12 U.S.C. §§ 5301, *et seq*., is a wide-ranging statutory scheme designed to regulate more effectively the entire financial services industry, and to protect both the general public, and industry professionals, from injury or harm.

112.    The Dodd-Frank Act offers protection from harm due to retaliatory measures by employers for individuals who engage in protected reporting activities as described by the Dodd-Frank Act.

113.    As a result of Plaintiff's disclosures and testimony, Plaintiff Price falls within the Dodd-Frank Act's protection from retaliation, in particular, 15 U.S.C. § 78u-6.

114.    UBS's retaliatory actions against Plaintiff as set forth herein were in violation of the Dodd-Frank Act.

115.    As a result of UBS's violation of the Dodd-Frank Act, Plaintiff Price has been harmed and suffered monetary damages, including, but not limited to, loss of retroactive and prospective pay.

116.     Plaintiff Price has been forced to bring this action and has retained the law firm of Henrichsen Siegel, P.L.L.C. to whom he is obligated to pay a reasonable fee. Pursuant to the provisions of 15 U.S.C. §78u-6, Defendant UBS is liable for Mr. Price's attorneys' fees incurred in bringing this action.

## COUNT II
### Retaliation in Violation of The Florida Whistleblower Act
### (Fla. Stat. §§ 448.102, et seq.)

117.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1-103 of this Complaint with the same force and vigor as if set out here in full.

118.     The Florida Whistleblower Act, § 448.102(3), Fla. Stat., provides, in relevant part, that an employer may not take retaliatory personnel action against an employee for objecting to, or refusing to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

119.     As described above, Plaintiff objected to, and refused to participate in, Defendant's serious violations of law, rule or regulation, including but not limited to the issues surrounding Mechior's unlawful acts and the FINRA investigation regarding the same.

120.     Defendant's conduct constituted, or Plaintiff reasonably believed that Defendant's conduct constituted, an activity, policy or practice of Defendant which was in violation of a law, rule, or regulation.

121.     The laws, rules or regulations violated by Defendant as set forth herein are within the meaning the Florida private-sector whistleblower statute, §§ 448.101-448.105, Fla. Stat.

122.     At all times relevant herein, Plaintiff objected to, and refused to participate in, Defendant's activities, policies and practices alleged herein.

123.     Defendant took retaliatory personnel action against Plaintiff, including but not limited to termination of employment, because Plaintiff objected to, and refused to participate in, Defendant's activities, policies and practices alleged herein that are in violation of § 448.102(3), Fla. Stat.

124.     As a direct and proximate result of the unlawful retaliatory actions of Defendant, Plaintiff has suffered, and will continue to suffer, damages, including but not limited to: lost back pay and front pay, lost benefits and entitlements, mental and emotional distress, mental pain and suffering, humiliation, loss of dignity, loss of enjoyment of life, expenses, and damage to his career and reputation.

**WHEREFORE**, Plaintiff Craig D. Price respectfully requests that this Honorable Court grant the following relief:

(A)     Enter judgment on behalf of Plaintiff against Defendant on all counts herein;

(B)     Award two times back pay lost by Plaintiff due to Defendant's wrongful termination of his employment plus pre- and post- judgment interest;

(C)     Award compensatory damages to Plaintiff, including for mental and emotional distress, mental pain and suffering, humiliation, loss of dignity, loss of enjoyment of life, expenses, damage to his career and reputation;

(D)     Award to Plaintiff reasonable attorneys' fees, costs of suit, all litigation costs allowable, and  pre-judgment and post-judgment interest; and

(E)     Grant such other relief to Plaintiff as this Court may deem fair and just.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 20, 2017                                  Respectfully submitted,

*/s/ Neil L. Henrichsen*
Neil L. Henrichsen
HENRICHSEN SIEGEL, P.L.L.C.
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036
(202) 862-4357
(202) 379-9792 (facsimile)
nhenrichsen@hslawyers.com
service@hslawyers.com
*Attorney for Plaintiff Craig D. Price*