## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CRAIG D. PRICE,** | |
| **Plaintiff,** | Civ. No. 17-1882 (WJM) |
| **v.** | |
| **UBS FINANCIAL SERVICES, INC.,** | **OPINION** |
| **Defendant.** | |

### WILLIAM J. MARTINI, U.S.D.J.

Plaintiff Craig D. Price ("Price") brings this action against his former employer of sixteen years, Defendant UBS Financial Services, Inc. ("UBS"), alleging retaliation in violation of the Florida Whistleblower Act, Fla. Stat. § 448.102. Price asserts UBS terminated his employment in February of 2016 because he reported to UBS potential misconduct by a fellow financial advisor, Dennis Melchior, in April of 2013, and because he testified about the potential misconduct before the Financial Industry Regulatory Authority ("FINRA") in July of 2014. This matter is now before the Court on UBS's motion for summary judgment. ECF No. 111. Having carefully considered the parties' submissions, ECF Nos. 111, 112, 115-122, the Court resolves the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, UBS's motion is **GRANTED**.

### I.    FACTUAL BACKGROUND [1]

In 2000, Price began working as a Financial Advisor in UBS's Stuart, Florida office. SUMF ¶ 1. During his employment at UBS, Price was the top-producing Financial Advisor in the Stuart, Florida UBS Branch Office and one of the highest-producing Financial Advisors in the Southeast Region. *Id.* ¶ 2. For reasons the parties dispute, UBS terminated Price's

---

[1] Pursuant to Local Civil Rule 56.1(a), UBS filed a statement of undisputed material facts ("SUMF"), ECF No. 111-3, in connection with its motion, and Price filed a responsive statement ("Pl. Resp. to SUMF"), ECF No. 115-1, and a supplemental statement of facts ("Pl. Supp. Statement"), ECF No. 115-2. While the Court has carefully reviewed Price's responses to or disagreements with UBS's statement, it is challenging to consider his responses as anything other than unsubstantiated allegations. Specifically, in his responsive statement, Price disputes many of UBS's proffered facts without citing to objective evidence in the record. *See generally* Pl. Resp. to SUMF, ECF No. 115-1. Instead, he cites to his supplemental statement of facts which, in turn, predominantly relies on his own declaration filed in connection to his opposition. *See generally* Pl. Supp. Statement, ECF No. 115-2; Price Decl., ECF No. 115-4. Price's supplemental statement of facts and his declaration are largely, substantively the same. To the extent the Court can identify a genuine dispute rooted in evidence in the record, it will note as much in its recitation of the facts.

employment on February 29, 2016. *Id.* ¶ 83. The events leading up to his termination are as follows.

## A. The Investigation Into Dennis Melchior

In 2008, Price began working with Dennis Melchior ("Melchior"), a fellow UBS employee with whom he partnered on certain high-value accounts. *Id.* ¶ 96. By November or December of 2010, Price became aware that Melchior was in a romantic relationship with Palm Beach socialite and UBS client Nancy Tsai ("Tsai"), who in turn was very close to a wealthy, elderly widow named Helga Marston ("Marston"). *Id.* ¶ 97; Price FINRA Dep. Tr. 75:14-78:19. Marston moved her trust account (the "Marston Trust Account" or "Account") to UBS in June of 2011. SUMF ¶ 100. The Account was Price's largest, though he split the revenues with Melchior who, along with Tsai, were the only two individuals Marston allegedly trusted to discuss her Account with. *Id.* ¶¶ 103-106; Price FINRA Dep. Tr. 82:10-83:2. Price never met Marston in person or spoke to her over the phone. SUMF ¶ 106. By December of 2011, Tsai had power-of-attorney over the Marston Trust Account. *Id.* ¶ 99.

In April of 2013, Tsai attempted to purchase a $2.35 million condominium with funds from the Account. *Id.* ¶ 109. The attempted purchase raised several "red flags" at UBS because Tsai was listed as the actual buyer; a manager who attempted to confirm the purchase with Marston over the phone was told Marston was unavailable because she was hard of hearing; and Marston's signature looked "materially worse" than the other samples UBS had. *Id.* ¶¶ 109-114. Multiple UBS employees, including Price, contemporaneously raised concerns on or about April 11 or April 12, 2013, about the attempted transaction and Melchior's reaction when it was declined. *Id.* ¶¶ 113-115; Trapani Dep. Tr. 23:19-24:1; Cowart Dep. Tr. 34:22-35:9. Price initially notified Complex Director Brad Smithy of his concerns by calling Smithy's cellphone on either April 11 or April 12 and leaving him a voicemail. Price Dep. Tr. 223:23-223:25; Pl. Supp. Statement ¶ 40.

UBS consequently initiated an investigation into the Marston Trust Account. SUMF ¶ 115. As part of the investigation, UBS Complex Control Officer Tracey Trapani sent an email on April 12, 2013, to local UBS managers, including Smithy, cataloguing activity in the Marston Trust Account "that may be questionable." *Id.* ¶ 116. On April 14, 2013, after undertaking his own review of Account transactions, Price also sent an email to Smithy cataloguing charges that he considered "suspicious" and that he connected to items on Melchior's calendar. *Id.* ¶¶ 117, 119; Def. Ex. 78 at 1. The email proceeds to identify transactions for which Tsai's credit card, checkbook, or debit card for the Marston Trust Account was used to pay for what Price believed were inappropriate expenses, such as business expenses related to Melchior's participation in UBS events and fundraisers. Def. Ex. 78 at 1-2. Price testified that Smithy forwarded this email to UBS Internal Investigator Saline Gerber, who then interviewed him about his concerns at some later date in April or June of 2013. *Compare* Am. Compl. ¶¶ 49-51 ("During the days that followed [April 15, 2013], Mr. Price was interviewed by Ms. Gerber."), *with* Price Dep. Tr. 214:15-214:17 ("I first blew the whistle

complaining about what I knew to be stealing from Helga Marston to [Gerber] in June of 2013.").

UBS promptly terminated Melchior's employment on April 23, 2013.  SUMF ¶ 123. The *Palm Beach Daily News* reported that Tsai was arrested and charged one year later, in April of 2014, with exploitation of and theft from an elderly person, though the charges were eventually dropped.  *See* SUMF ¶ 130; Def. Ex. 82.  In or around July of 2014, Price, along with UBS employees Trapani, Complex Administrative Manager Jan Cowart, and Associate Branch Manager Timothy Durno testified before FINRA in connection with FINRA's review into Melchior's conduct.  SUMF ¶¶ 124-126.  Price also provided FINRA with his daily personal journal entries that he had drafted throughout the investigation detailing what he had learned about Melchior and the suspicious Account transactions.  Pl. Resp. to SUMF ¶ 136; Price Decl., Ex. B., ECF No. 120-2.  In December of 2014, FINRA completed its investigation and issued Melchior a Cautionary Action Letter as a formal warning with respect to "FINRA Rule 2010, Conduct Inconsistent with Just and Equitable Principles of Trade," because he had "failed to follow Firm procedures regarding disclosures to the Firm of one or more expenses that were paid using a Firm customer's funds."  SUMF ¶¶ 127-128.

## B.  Price's Compliance With UBS Policies

Price asserts that once he reported Melchior to UBS and testified before FINRA, UBS began questioning and investigating his compliance with certain firm policies that UBS had not questioned before.  Pl. Resp. to SUMF ¶ 136.  Price maintains, without pointing to demonstrative evidence in the record, that some or all of the below policies were, in practice, inconsistently enforced.  *See, e.g.*, *id.* ¶¶ 17, 65.

### 1.  Non-Cash Compliance Policy

Specifically, UBS had a Non-Cash Compliance Policy that governed employees' acceptance of "non-cash compensation" from vendors.  SUMF ¶¶ 137-138.  The Policy prohibited multiple vendors from sponsoring entertainment events for groups of more than ten individuals.  *Id.* ¶¶ 143, 146.  Compliance with this Policy was a firm-wide initiative at UBS in the spring of 2014 due to recent, higher scrutiny by regulators.  *Id.* ¶¶ 139-140.  Within the Florida Southeast Complex, however, at least two directors or managers testified that the Policy, which had apparently recently been put in place, was confusing "in that it had a lot of moving pieces" or was inconsistently applied.  *See* Pl. Resp. to SUMF ¶¶ 138-140; Foley Dep. Tr. 94:4-97:8; Sukis Dep. Tr. 81:20-81:25.

Although Price contends his business events were never questioned prior to his July 2014 FINRA testimony, UBS compliance personnel questioned his team as early as February of 2014 about a January event sponsored by multiple vendors that violated the Non-Cash Compliance Policy.  SUMF ¶ 142.  In mid-2015, UBS compliance personnel questioned another of Price's events that he had hosted in January of 2015 and that similarly violated the Non-Cash Compliance Policy.  *Id.* ¶ 145.  UBS issued a Letter of Caution concerning the event

to two members of Price's team in April of 2016, after Price had already been terminated.  *Id.* ¶ 147.

## 2. The Communications, Solicitation, Penny Stocks, and Insider Trading Policies

In addition to questioning Price's compliance with the Non-Cash Compliance Policy, UBS initiated an independent investigation in mid-2015 into certain of Price's trading activities.  *See* SUMF ¶¶ 7-12.

Between May of 2014 (two months before Price testified before FINRA) and July of 2015 (one year after Price testified before FINRA), UBS received a series of complaints from two of Price's clients regarding Price's trading in Cardero stock.  *Id.* ¶¶ 6-11.  One of those clients also filed a complaint with FINRA on August 4, 2014.  *Id.* ¶ 7.  Price had amassed over one million shares of Cardero stock for himself and his clients between 2010 and 2012; however, between 2010 and 2016, Cardero's share price fell from a high of over $20 per share to approximately $0.05 per share.  *Id.* ¶ 5.  Price asserts, without citing to objective evidence, that "[a]t no time was Cardero stock trading higher than $3 a share, as [it] had a 1 for 10 reverse stock split in October 2015 that changed the historical price range of the stock."  Pl. Resp. to SUMF ¶ 5.

The two clients complained of, among other issues, losses in their investments; that Price's purchase of Cardero stock was improper and speculative; that Price had organized client events at which Cardero's CEO met with potential investors; and that Price had shared research favorably portraying Cardero but withheld more critical information about the company, including news that it did not meet New York Stock Exchange listing standards and that it was questionable whether the company could continue its operations or meet its financial obligations.  SUMF ¶¶ 6-11.  UBS denied each of the clients' complaints, finding Price's investments were not inappropriate for their accounts.  Mandody Dep., Exs. 2-5.  Nonetheless, the complaints prompted UBS to retain outside counsel at Riker Danzig Scherer Hyland & Perretti LLP ("Riker Danzig") to investigate Price's Cardero-related investment activities.  SUMF ¶ 12; Mandody Dep. Tr. 62:14-63:22.  During the investigation, Price was interviewed on three occasions: September 10, 2015, November 10, 2015, and December 8, 2015.  SUMF ¶ 13.  The investigation revealed information that led UBS to conclude Price had violated at least four UBS policies.  *Id.* ¶ 16.

First, UBS concluded that Price violated its Communications Policy, which prohibits all unauthorized contact between Financial Advisors and members of the media, including online media outlets.  *Id.* ¶ 17.  Specifically, UBS found that Price's unauthorized, repeated contact with Chris Barker ("Barker"), a blogger at the online media outlet *The Motley Fool*, violated the Policy.  *Id.* ¶ 28.  In December of 2010, and for fifteen months thereafter, Price regularly emailed with Barker, seeking to draw Barker's attention to and discuss Cardero.  *Id.* ¶¶ 18, 20-21.  In 2011, Price invited Barker to join at least two calls with Cardero management.  *Id.* ¶¶ 22-24.  Barker then published a Cardero-related article in 2011 and one in 2012 describing

Cardero as an undervalued investment. *Id.* ¶¶ 25-27. UBS also concluded that Price violated additional provisions of the Communications Policy by sending unapproved, third-party research reports regarding Cardero to UBS clients, and by sharing only favorable reports about Cardero, even in the face of the stock's poor performance and eventual delisting from the New York Stock Exchange and even when he knew of or was in possession of more critical information. *Id.* ¶¶ 29-45.

Second, UBS concluded that Price violated its Solicitation Policy, which imposes requirements on Financial Advisors who recommend the purchase or sale of stocks to UBS clients. *Id.* ¶ 46. In the case of certain kinds of high-risk securities, Financial Advisors must fill out Solicitation Advisory Forms ("SAFs") in order to ensure they have performed the necessary due diligence to support a solicitation and to ensure that UBS has oversight of the high-risk securities being recommended to its clients. *Id.* ¶ 47. Between May 14, 2009, and September 10, 2012, Price completed a total of twelve or thirteen SAFs regarding Cardero, and UBS approved each one. *Id.* ¶ 48; Pl. Resp. to SUMF ¶ 48; Def. Exs. 40-51. The SAFs ask, in part, whether the Financial Advisor has "made any contact with officers, directors, employees, or other representatives of the issuer" and, if so, to explain those contacts. Def. Exs. 40-51. UBS found that Price was in contact with several Cardero executives in 2011 and 2012, and while he disclosed some of those contacts on the SAFs, he failed to disclose others. SUMF ¶¶ 50-52. UBS also found that Price represented to two other UBS employees that he had a relationship with Cardero, but that he responded "No" to the SAF question asking whether he had a relationship with the company or any of its officers or directors. *Id.* ¶ 57. Price disputes UBS's characterization of "relationship" and asserts he had no familial ties to the company. Pl. Resp. to SUMF ¶ 53. UBS found that Price continued to solicit trades in Cardero after his last SAF expired. SUMF ¶¶ 58-60.

Third, UBS concluded that Price violated its Penny Stocks Policy, which prohibits Financial Advisors from soliciting trades in penny stocks "under any circumstances." *Id.* ¶ 6. Cardero became a penny stock, as defined by the Policy, on December 6, 2013, when it was delisted from the New York Stock Exchange and was trading for less than five dollars per share. *Id.* ¶¶ 61-64. UBS found that Price continued to solicit trades in Cardero after it became a penny stock. *Id.* ¶¶ 65-66.

Finally, UBS concluded that Price violated its Insider Trading Policy, which prohibits those in possession of "Unpublished Price Sensitive Information" from engaging in trading in securities of companies about which they have such information. *Id.* ¶¶ 67-68. Price acknowledges that he possessed non-public information about Cardero on certain occasions in 2011 and 2015, but disputes that information was material. *Id.* ¶¶ 71-74; Pl. Resp. to SUMF ¶¶ 71-74, 78-79. In 2011, Price learned from a Cardero executive via email that the Cardero Board was likely to vote to approve a merger with another company. SUMF ¶¶ 73-74. UBS maintains that after receiving this information, but before the information became public, Price executed five trades in Cardero involving the purchase of 27,000 shares, *id.* ¶ 76; however, in light of the emails being exchanged over different time zones, Price asserts he received the

email after the U.S. stock markets had already closed and did not execute any trades in reliance on the emails.  Pl. Resp. to SUMF ¶ 76.

### C.  Price's Termination

On February 29, 2016, in light of the results of the Riker Danzig investigation, UBS Complex Director Peter Foley and Branch Office Manager Clifford Mandody informed Price that UBS was terminating his employment for conduct that violated the firm's policies.  SUMF ¶ 83.  On March 18, 2016, UBS filed the requisite Form U-5 with FINRA about Price's termination and briefly explained that Price had violated several UBS compliance policies.  *Id.* ¶¶ 86-87.  Although UBS contends it considered Price's attorneys' comments in finalizing the language in the Form U-5, Price asserts that the Form U-5 is "materially false."  *Id.* ¶ 88; Pl. Resp. to SUMF ¶ 88.  FINRA subsequently investigated Price's termination and both UBS and Price responded to FINRA's requests for additional information.  SUMF ¶¶ 90-91, 93.  On May 6, 2016, Price, through counsel, also submitted a letter to the Certified Financial Planner Board of Professional Standards detailing the underlying conduct for which UBS terminated him.  *Id.* ¶ 94.

## II.    PROCEDURAL HISTORY

Based on the foregoing, Price initiated this lawsuit against UBS on March 22, 2017, alleging UBS wrongfully terminated him in retaliation for being a whistleblower insofar as he reported Melchior's conduct and testified before FINRA.  *See generally* Compl., ECF No. 1. The original Complaint alleged a cause of action for retaliation in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), 15 U.S.C. § 78u-6, and a cause of action for retaliation in violation of the Florida Whistleblower Act ("FWA"), Fla. Stat. § 448.102.  *Id.* ¶¶ 104-16, 117-24.  UBS moved to dismiss the Complaint on June 12, 2017, for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court denied the motion as to the FWA claim and stayed the motion as to the Dodd-Frank Act claim pending the outcome of the Supreme Court case *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767 (2018), addressing the statutory definition of "whistleblower."  *See* Op., ECF No. 19.

On December 11, 2017, UBS moved to compel arbitration, which the Court denied, finding UBS waived its right to invoke arbitration and chose instead to litigate the merits.  *See* Op., ECF No. 30.  On March 16, 2018, UBS moved to lift the stay and dismiss the remaining Dodd-Frank Act claim.  ECF No. 32.  The Court granted the motion and dismissed that claim with prejudice, finding, in line with *Digital Realty Trust*, that Plaintiff did not qualify as a whistleblower under the Dodd-Frank Act because he could not allege that he reported information to the Securities and Exchange Commission prior to his termination.  *See* Op., ECF No. 44.  To reflect the Court's ruling, Price filed an Amended Complaint removing the allegations related to the dismissed Dodd-Frank Act claim.  *See generally* Am. Compl., ECF No. 47-2.  The Court continues to exercise subject matter jurisdiction over the remaining FWA

claim pursuant to 28 U.S.C. § 1332(a) based on the diverse citizenship of the parties and an amount in controversy exceeding $75,000.

UBS now moves for summary judgment on the remaining FWA claim.  ECF No. 111. The motion is fully briefed and ripe for consideration.  *See* ECF Nos. 111, 115, 121.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In deciding a motion for summary judgment, the Court construes all facts and inferences in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact—that is, the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986).  Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts."  *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)) (emphasis in original and internal quotation marks omitted).  The non-moving party must present actual evidence that creates a genuine issue for trial—reliance on unsupported assertions, speculation, or conclusory allegations is insufficient to defeat a motion for summary judgment.  *Solomon v. Soc'y of Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002) (citing *Celotex*, 477 U.S. at 324); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

Furthermore, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986).  "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 248, (1986)).  "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

### IV.    DISCUSSION

#### A. The FWA Framework

The FWA is a remedial statute "designed 'to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public.'" *Bonnafant v. Chico's FAS, Inc.*, 17 F. Supp. 3d 1196, 1200 (M.D. Fla. 2014) (quoting *Arrow Air, Inc. v. Walsh*, 645 So. 2d 422, 424 (Fla. 1994)); *Berber v. Wells Fargo, NA,* 798 F. App'x 476, 480 (11th Cir.).   Each of the statute's three subsections identifies certain employee conduct constituting "protected activity."   *See Villaman v. United Parcel Serv., Inc.*, No. 18-21377, 2019 WL 922704, at *5 (S.D. Fla. Feb. 8, 2019).

Subsection Three of the FWA prohibits an employer from taking "any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."   Fla. Stat. § 448.102(3).   The FWA expressly defines "law, rule, or regulation" as "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business."   *Id.* § 448.101(4).   Subsection Two of the FWA likewise prohibits retaliation because the employee has "[p]rovided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer."   *Id.* § 448.102(2).

Florida courts analyze FWA retaliation claims in the same manner as Title VII retaliation claims.   *Butterworth v. Lab'y Corp. of Am. Holdings*, 581 F. App'x 813, 818 (11th Cir. 2014); *Butterfield v. JetBlue Airways Corp.*, No. 20-13473, 2022 WL 291003, at *4 (11th Cir. Feb. 1, 2022).   Accordingly, to establish a *prima facie* case of retaliation under the Subsections articulated above, Price must demonstrate: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events.   *Berber*, 798 F. App'x at 478-79.   If Price presents a *prima facie* case, the burden shifts to UBS to articulate "a legitimate, non-retaliatory reason for the challenged employment action."   *Butterworth*, 581 F. App'x at 816; *Rutledge v. SunTrust Bank*, 262 F. App'x 956, 958 (11th Cir. 2008).   Then, if UBS meets its burden, the burden shifts back to Price to demonstrate that UBS's proffered reasons are "mere pretext."   *Berber*, 798 F. App'x at 479; *Butterworth*, 581 F. App'x at 816.

There is no dispute that Price suffered an adverse employment action and, as a result, can satisfy the second element of the *prima facie* case standard.   The parties' disputes center on whether Price can satisfy the first and third elements based on the undisputed material facts and record evidence.

### B.  Whether Price Engaged in Statutorily Protected Activity Under Subsection Three of the FWA

The Court turns first to Price's retaliation claim under Subsection Three.   The claim is premised on his April 2013 disclosures to UBS Complex Director Brad Smithy and UBS Internal Investigator Saline Gerber concerning Melchior's supposed misuse of funds from the Marston Trust Account.   *See* Am. Compl. ¶¶ 48-51, 107, ECF No. 47-2.

UBS argues that Price cannot establish a *prima facie* case of retaliation under Subsection Three because he cannot show he engaged in protected activity within the meaning of the FWA. To satisfy the "protected activity" element, Price "must show that he 'objected to or refused to participate in (i) an illegal activity, policy, or practice of an employer, (ii) illegal activity of anyone acting within the legitimate scope of their employment, or (iii) illegal activity of an employee that has been ratified by the employer.'" *Butterfield*, 2022 WL 291003, at *4 (quoting *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013)). The fundamental question is not which category of illegal activity is most applicable here, but whether the evidence shows Price objected to illegal activity at all.

Florida's intermediate appellate courts disagree on the standard a plaintiff-employee like Price must meet to prevail on the "protected activity" element, and the Florida Supreme Court has not resolved the disagreement. *Id.* at *5. The Fourth District Court of Appeal held in *Aery v. Wallace Lincoln–Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013) that an employee satisfies this element by showing he had "a good faith, objectively reasonable belief that his activity is protected by the statute." Thus, in *Aery*, the court found the plaintiff satisfied the "protected activity" element where he "did not specifically tell his supervisor what laws the . . . manager allegedly was breaking," but where the evidence showed: the plaintiff observed his manager commit acts which, if true, appeared to be illegal; the plaintiff could have reasonably believed the acts were illegal; and the plaintiff "immediately and repeatedly report[ed] this matter to his superiors and describ[ed] these acts as 'against the law.'" *Id.*

In contrast to *Aery*, the Second District Court of Appeal has said that the "protected activity" element requires the plaintiff-employee to "prove that he objected to an actual violation of law." *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 465 (Fla. Dist. Ct. App. 2015). In other words, the plaintiff-employee must present evidence in his case that *proves* the objected-to conduct violates a specific statute.[2] *Id.* at 466 ("[Plaintiff] had to prove the elements of a claim for a specific statutory violation."); *see, e.g.*, *Pierre v. AIDS Healthcare Found., Inc.*, No. 19-6255, 2020 WL 6381557, at *5-8 (S.D. Fla. Oct. 30, 2020). It is this standard that UBS asks the Court to apply. Def. Br. at 26, ECF No. 111-2. Price does not argue for or against the application of either standard. Pl. Opp. Br. at 12-14, ECF No. 115.

If the Court applies *Kearns*' "actual violation" standard, Price must present evidence proving Melchior's purported misuse or misappropriation of funds from the Marston Trust Account violates a specific statute. *Kearns*, 157 So. 3d at 466. Price plainly fails to do so. Nowhere in his April 14, 2013 email to Smithy cataloguing suspicious transactions, his Amended Complaint, or his brief in opposition to the present motion does Price identify a specific statute that Melchior's conduct violated. Instead, Price proceeds to litigate this matter

---

[2] The disagreement among Florida's intermediate appellate courts has necessarily resulted in a disagreement among Eleventh Circuit district courts, with some district courts adopting *Aery*'s good faith, objectively reasonable belief standard, and others rejecting *Aery* and adopting *Kearns*' heightened actual violation standard. *Pierre*, 2020 WL 6381557, at *4 nn.7-8 (collecting cases applying the competing standards).

on the general theory that "Melchior's actions appeared to violate UBS's policies . . ., various FINRA rules and possibly, laws against theft and elder abuse."[3]  Am. Compl. ¶ 59, ECF No. 47-2; *see* Pl. Opp. Br. at 12-14, ECF No. 115.

Price argues that there are disputes of material fact "that UBS is responsible" for "violations of Florida civil and criminal laws concerning elder exploitation" but has not adduced any evidence from which a reasonable jury could conclude that Melchior's conduct violated the law.  *See* Pl. Opp. Br. at 12, ECF No. 115.  Price attempts to meet his burden by asserting, without citing to specific lines of testimony, that his expert Imani Boykin, Esq., "opined finding violations of Florida civil and criminal laws concerning elder exploitation . . . and that UBS was responsible for such violations." *Id.*  This is insufficient to create a genuine dispute of material fact and, at face value, is impermissible witness testimony regarding ultimate legal conclusions. *See Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) ("The rule prohibiting experts from providing their legal opinions or conclusions is . . . a kind of axiomatic principle." (quotation marks and citation omitted)); *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1350 n.6 (S.D. Fla. 2017) ("[A]n expert witness may not testify as to his opinion regarding ultimate legal conclusions." (quotation marks and citation omitted)).  Price's additional assertions that UBS is "responsible for these crimes" because he "made protected disclosures directly to FINRA" and because UBS's Florida Southeast Complex had an "unsatisfactory" compliance rating in 2014 and 2015, are likewise insufficient to prove Melchior's conduct violated a specific statute.  *See* Pl. Opp. Br. at 13-14, ECF No. 115.  Under *Kearns*' "actual violation" standard then, Price cannot satisfy the "protected activity" element, and thus cannot establish a *prima facie* case of retaliation under Subsection Three of the FWA.  The Court's analysis theoretically would end here and UBS's motion for summary judgment would be granted.

If, however, the Court applies *Aery*'s less stringent "good faith" standard, Price need only show that at the time he objected to Melchior's conduct, he had a good faith, objectively reasonable belief that Melchior's conduct was illegal. *Aery*, 118 So. 3d at 916.  This standard

---

[3] The Court notes that Price's Declaration filed with his opposition to the present motion states:

> Violations of the following "laws, rules, or regulations" by management of UBS . . . [which] is based upon learning of Dennis Melchior's activities related to the Marston Trust in April 2013, July 2014 during my FINRA testimony and the preparation for the same, the publicity of the Marston Trust unlawful acts in the media, retaliatory harassment of me, and their involvement in the termination of me in January-February 2016, include: Florida Elder Abuse, Florida Statute § 825; Florida Adult Protective Services Act, Florida Statutes Sections 415.101-113;  . . . violation by UBS of 18 U.S.C. § 1514A(a)(l), the Consumer Financial Protection Act; violation by UBS of Section 806 of the Sarbanes-Oxley Act ("SOX"); and violation by UBS of [the Dodd-Frank Act],12 U.S.C. §§ 5301, *et. seq.*

Price Decl. ¶ 62, ECF No. 115-4.  If Price wished to base his FWA retaliation claims on objected-to conduct that allegedly violated these laws, he should have either raised these legal theories and the factual bases for liability in his pleading or amended his operative pleading to allege them.  *See Pierre*, 2020 WL 6381557, at *6 (disallowing plaintiff, in her response to defendant's motion for summary judgment, "to broaden the universe of purported laws, rules, and regulations that [defendant] allegedly violated," and collecting cases holding same).

does not require "that [Price] provide his employer with statutory and case law citations to support his claim of illegal conduct."  *Id.*

The record evidence is conflicting as to whether Price held a reasonable belief that Melchior engaged in conduct that violated the law.  In Price's April 14, 2013, email to Smithy cataloguing suspicious transactions from the Marston Trust Account, Price states, "here is the summary of charges/expenses on the Marston Trust that I have found and connected to items on [Melchior's] calendar."  Def. Ex. 78 at 1.  Nothing in the email suggests Price believed Melchior's conduct or the transactions violated any laws.  Price testified, however, that when he uncovered the problems with Melchior, "[he] asserted that . . . the misappropriation of customer funds was deliberate and illegal."  Price Dep. Tr. 249:25-250:2.  Additionally, Price contends that he "reported crimes" to UBS Internal Investigator Saline Gerber concerning Melchior and Tsai's spending of Marston Trust Account funds for their own personal benefit and the benefit of UBS.  Pl. Opp. Br. at 12-13, ECF No. 115.  Price testified that he complained to Gerber "about what [he] knew to be stealing from Helga Marston."  Price Dep. Tr. 214:15-214:17.

Taking the evidence in the light most favorable to Price, there is record evidence from which a reasonable jury could conclude that he held a good faith, objectively reasonable belief that Melchior's use of funds from the Marston Trust Account was illegal.  *See, e.g.*, *Ritenour v. AmeriGas Propane, Inc.*, No. 18-80574, 2019 WL 2008675, at *7 (S.D. Fla. Mar. 15, 2019) (finding sufficient record evidence that plaintiff held a reasonable belief of illegal activity, even though his testimony was inconsistent as to whether he believed the objected-to conduct was illegal or "bad business practice").  Under *Aery*'s "good faith" standard then, Price can satisfy the "protected activity" element, the first element required for purposes of surviving summary judgment.  The Court's analysis would then proceed to the next contested element of the *prima facie* standard for retaliation: causal connection between Price's protected activity and his termination.  For the reasons discussed further below, Price ultimately fails to show a causal connection and, consequently, cannot establish a *prima facie* case of retaliation to survive summary judgment.  The Court therefore need not resolve whether it should definitively apply *Kearns*' "actual violation" standard or *Aery*'s "good faith" standard; regardless of which standard applies, the record evidence does not support a finding of causal connection.

### C. Whether Price Engaged in Statutorily Protected Activity Under Subsection Two of the FWA

The Court turns briefly to Price's retaliation claim under Subsection Two of the FWA to the extent the Amended Complaint can be construed as alleging such.  *See* Pl. Opp. Br. at 17-18, ECF No. 115.  Subsection Two prohibits retaliation because the employee has "[p]rovided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer."  Fla. Stat. § 448.102(2).  Price's claim is therefore premised on his July 2014 testimony before FINRA related to FINRA's investigation into Melchior.  Am. Compl. ¶¶ 64-68, ECF No. 47-2.  The Court assumes, as the parties do, and for purposes of

reaching the causal connection element, that Price's FINRA testimony constitutes protected activity within the meaning of Subsection Two.  *See* Def. Br. at 37-38, ECF No. 111-2.

### D. Whether There is a Causal Connection Between Price's Protected Activities and His Termination

UBS argues that Price cannot establish a *prima facie* case of retaliation under either Subsection Three or Subsection Two of the FWA because there is no evidence of a causal connection between the protected activities—that is, his April 2013 objections to Melchior's conduct and his July 2014 testimony before FINRA—and the adverse employment action, his February 2016 termination.  *Id.* at 30.

UBS argues, and Price does not dispute, that to establish a causal connection Price must show that he would not have been terminated but for his engaging in the protected activities. *Id.*; Pl. Opp. Br. at 14-15, ECF No. 115.  Under the Supreme Court's holding in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013), a plaintiff in a retaliation case must ultimately present "proof that the desire to retaliate was the but-for cause of the challenged employment action."  The caselaw varies as to whether the "but-for" standard applies at the *prima facie* stage or at the pretext stage of the analysis.  *See Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1365 n.30 (M.D. Fla. 2016) (stating "[n]either the Supreme Court nor the Eleventh Circuit has clarified the stage at which the 'but-for' standard applies" and comparing Eleventh Circuit cases).  *Compare DeBose v. USF Bd. of Trustees*, 811 F. App'x 547, 557-58 (11th Cir. 2020) (addressing "but-for" causation in relation to the causal connection element), *with Butterworth*, 581 F. App'x at 817 (addressing "but-for" causation only after discussing the *prima facie* elements and the employer's proffered legitimate, non-retaliatory reasons).

Generally, however, causation is satisfied at the *prima facie* stage if a plaintiff shows that the decisionmakers were aware of the protected conduct, and that the protected conduct and the adverse action were not "wholly unrelated."  *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Ritenour*, 2019 WL 2008675, at *7.  "Close temporal proximity alone can establish the necessary causal connection, but if it is not 'very close,' other evidence is required to establish the connection, and a delay of three to four months between the two events is considered substantial." *Temple v. City of Crestview*, No. 19-2989, 2021 WL 1209851, at *8 (N.D. Fla. Mar. 31, 2021) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  "In the absence of close temporal proximity, a series of adverse employment actions commenced shortly after protected conduct may establish causation."  *Id.* (citing *Entrekin v. City of Panama City Fla.*, 376 F. App'x 987, 996 (11th Cir. 2010)); *see Baroudi v. Sec'y, U.S. Dep't of Veterans Affs.*, 616 F. App'x 899, 903 (11th Cir. 2015) ("A causal relationship might reasonably be inferred from a series of adverse actions that commenced immediately after a plaintiff engaged in protected activity.").

Here, Price is unable to rely on temporal proximity alone to support an inference of causation.  There is a years-long gap between when Price first reported Melchior's conduct in

April of 2013 and testified before FINRA in July of 2014, and when UBS terminated his employment on February 29, 2016.  Price argues "it makes common sense that the retaliation would start up in 2015" because he "was out of the office regularly the last quarter of 2014, and was unavailable to be a target of retaliation."  Pl. Opp. Br. at 15, ECF No. 115.  But this assertion does not explain the nearly three years that lapsed between his initial reporting and his termination, or the more than one and a half years that lapsed between his FINRA testimony and his termination.  The Eleventh Circuit has found periods of three to four *months* too long to satisfy the causation element.  *See Gilliam v. U.S. Dep't of Veterans Affs.*, 822 F. App'x 985, 990 (11th Cir. 2020) ("[T]he lapse of three months between . . . statutorily protected expression and the adverse employment action is too long to permit an inference of causation based on temporal proximity alone."); *Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.").

Because he cannot show close temporal proximity, Price must present evidence—such as of a series of adverse employment actions commenced *immediately* or *shortly after* he engaged in protected activity—from which a reasonable jury could find a causal connection between his April 2013 reporting and his February 2016 termination, or between his July 2014 FINRA testimony and his February 2016 termination.  *See Baroudi*, 616 F. App'x at 903; *Entrekin*, 376 F. App'x at 996.  Price fails to do so.

He first argues that a causal connection can be inferred because the decision to terminate his employment did not come from Complex Director Peter Foley, Complex Director Brad Smithy, and Branch Office Manager Clifford Mandody, but rather "came from top levels of UBS."  Pl. Opp. Br. at 14-15, ECF No. 115.  It is not clear how this demonstrates a causal connection, but Foley, Smithy and Mandody all consistently testified that they participated in the collective decision-making process to terminate Price's employment.  Foley Dep. Tr. 39:14-39:16, 40:24-41:4 ("It was a decision made by myself in conjunction with [Smithy], his regional team and my complex team."); Smithy Dep. Tr. 123:22-125:13 (explaining the group decision-making process and testifying, "I was brought in when the group . . . had decided that termination was the appropriate next step, and it was brought to me . . . for my weigh-in or my approval."); Mandody Dep. Tr. 19:1-19:20 (testifying that "Peter Foley, myself and Brad Smithy" participated in the decision, and that "the results of the review were discussed and the recommendation was made that [Price] should be terminated, and I was part of that recommendation.").

Price next argues that a causal connection can be inferred because Foley acknowledged his "whistleblower status" in an email dated April 24, 2014, and then in 2015, UBS began questioning Price's marketing events and investigating client complaints related to his investments, despite UBS never having done so before.  Pl. Opp. Br. at 15, ECF No. 115.

As to the context of the April 24, 2014 email, Foley sent the email to Smithy, Complex Administrative Manager Jan Cowart, Associate Branch Manager Timothy Durno, and Southeast Regional Supervisory Officer Carol Sukis, writing that Price was concerned that

materials had been produced to Melchior's attorney revealing his involvement in Melchior's termination.   Foley Dep., Ex. 3.   Foley wrote to confirm that nothing had been sent to Melchior's attorney and stated, "I would suspect the whistleblower status would preclude that from happening."   *Id.*   Even if the Court assumes from this email that UBS considered Price to be a "whistleblower," record evidence fatally undermines any causal connection between his April 2013 and July 2014 activities and UBS's questioning and investigation.

First, there is a significant period of time between Price's April 2013 reporting of Melchior's conduct and early 2015 when Price maintains the "harassment" by UBS began.   *See* Pl. Opp. Br. at 15, ECF No. 115.   Likewise, there is at least five to six months between Price's July 2014 testimony before FINRA and early 2015.   If Courts have found periods of three to four months between the protected conduct and the adverse employment action to be too long to support an inference of causation, it cannot be that a series of adverse actions commenced five months to one and a half years after the protected conduct supports an inference of causation.   *See Baroudi*, 616 F. App'x at 903 ("A causal relationship might reasonably be inferred from a series of adverse actions that commenced *immediately* after a plaintiff engaged in protected activity." (emphasis added)).

Price's proposed causal connection is further undermined by the undisputed fact that Complex Control Officer Tracey Trapani, Complex Administrative Manager Jan Cowart, and Associate Branch Manager Timothy Durno—the three other UBS employees who assisted in the April 2013 identification and investigation of Melchior's purported misconduct, and who also testified before FINRA in mid-2014—either remain employed at UBS or retired voluntarily.   SUMF ¶¶ 134-135.   It is also undisputed that the substance of Price's FINRA testimony was confidential; Foley, Smithy, and Mandody—the UBS employees who collectively made the decision to terminate Price's employment—were not present at Price's FINRA testimony and did not discuss the testimony with him.   *Id.* ¶¶ 132-133.

Lastly, Price maintains that UBS's harassment took the form of increased scrutiny into his marketing events and whether they complied with UBS's Non-Cash Compliance Policy. But in an email dated July 9, 2014, sent to more than one hundred UBS employees, including Price, Foley wrote that "the scrutiny in our business has many levels and some of the more recent regulatory inquiries have branched into non-cash comp."   Def. Ex. 95 at 1.   Foley advised employees to ensure they were appropriately recording non-cash compensation because regulators were looking more closely to identify discrepancies.   *Id.*   When asked about this email at his deposition, Price testified, "I don't have any reason to doubt that that's what the regulatory environment was like.   I had heard that from other sources as well."   Price Dep. 212:4-212:19.

For these reasons, Price has failed to present evidence from which a reasonable jury could find a causal connection between his April 2013 reporting of Melchior's conduct, his July 2014 testimony before FINRA, and the termination of his employment on February 29, 2016.   He cannot satisfy the third and final element of the *prima facie* standard and, therefore,

cannot establish a *prima facie* case of retaliation under either Subsection Three or Subsection Two of the FWA.

### E. Whether UBS Had Legitimate, Non-Retaliatory Reasons to Terminate Price's Employment and Whether Those Reasons Were Pretextual

Even assuming that Price could make out a *prima facie* case of retaliation, UBS's proffered reason for his termination—his violations of the firm's Communications, Solicitation, Penny Stocks, and Insider Trading Policies—is a legitimate, non-retaliatory reason for his termination. *See* Def. Br. at 33-34, ECF No. 111-2. The violations were uncovered during the Riker Danzig-led investigation into Price's Cardero-related trading activities—an investigation UBS initiated after two of Price's clients filed multiple complaints with UBS, and one complaint with FINRA, concerning Price's trades.

Price attempts to refute the legitimacy of UBS's proffered reason not by demonstrating that his conduct did *not* violate UBS's policies, but by arguing that UBS's reasons must be pretextual because UBS had already denied his clients' complaints and because his expert on insider trading testified there was "[an] insufficient basis for concluding" that Price possessed material information. Pl. Opp. Br. at 5-6, 16-17, ECF No. 115. The Court finds such pretext arguments uncompelling and insufficient to satisfy Price's burden at this final stage of the FWA analysis. As Defendant explained, "[t]he question of whether Cardero was an appropriate purchase for those clients' accounts is entirely separate from the question of whether Price's conduct with respect to Cardero was in compliance with UBS policies." Def. Reply at 14, ECF No. 121. Furthermore, even if there is a genuine dispute as to whether Price possessed and acted on information that was both nonpublic *and* material in violation of UBS's Insider Trading Policy, the unchallenged fact remains that the decision to terminate his employment was based on his violating three other firm policies. To that end, Price has failed to put forth evidence from which a reasonable jury could find that UBS's proffered legitimate, non-retaliatory reason to terminate his employment was "mere pretext." *See Berber*, 798 F. App'x at 479; *Butterworth*, 581 F. App'x at 816. Accordingly, UBS's motion for summary judgment is due to be granted.

### V.    CONCLUSION

For the reasons stated above, UBS's motion for summary judgment, ECF No. 111, is **GRANTED**. An appropriate Order shall follow.

_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date:  April  7th, 2022**